# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MISSOURI
# SOUTHEASTERN DIVISION

| | |
|---|---|
| NANETTE STEIBEL, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 1:19-CV-118 PLC |
| | ) |
| ANDREW SAUL, | ) |
| Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM AND ORDER

Plaintiff Nanette Steibel seeks review of the decision by Defendant Commissioner of Social Security denying her application for Supplemental Security Income (SSI) under the Social Security Act.  For the reasons set forth below, the Court affirms the Commissioner's decision.

**I.     Background**

In October 2016, Plaintiff, who was born in June 1965, filed an application for SSI alleging that she was disabled as of March 14, 2012 as a result of:  severe degenerative disc disease, bulging discs, depression, "numb hands and legs," and arthritis.[1]  (Tr. 104, 194-203) The Social Security Administration (SSA) denied Plaintiff's claims, and she filed a timely request for a  hearing before an administrative law judge (ALJ).  (Tr. 121-30)

In July 2018, the ALJ conducted a hearing at which Plaintiff and a vocational expert testified.  (Tr. 29-79)  In a decision dated December 3, 2018, the ALJ found that Plaintiff "has not been under a disability, as defined in the Social Security Act, since October 26, 2016, the date the application was filed[.]"  (Tr. 11-23)  Plaintiff filed a request for review of the ALJ's

---

[1] The Commissioner previously denied Plaintiff's applications for Disability Insurance Benefits in August 2015, March 2004, and December 2003.  (Tr. 225-26)

1

decision with the SSA Appeals Council, which denied review. (Tr. 1-4) Plaintiff has exhausted all administrative remedies, and the ALJ's decision stands as the SSA's final decision. Sims v. Apfel, 530 U.S. 103, 106-07 (2000).

## II.     Evidence Before the ALJ

Plaintiff was fifty-three years old, lived in her son's basement, and had a twelfth-grade education and past work experience as a line worker, union laborer, and owner of a "union demolition business." (Tr. 42, 68-69, 229) Plaintiff's most recent job, which was at a factory, ended in 2012 because she injured her back. (Tr. 46, 229) Since that time, Plaintiff had done some work for a friend who owned a parking lot in downtown St. Louis, explaining "I worked down there a little bit, but I can't even do that hardly anymore. So sometimes I'll go down there and just drive the people on a golf cart back and forth [between the stadium and parking lot]." (Tr. 47) Plaintiff stated she last worked in May 2018. (Id.)

When the ALJ asked Plaintiff why she believed she could no longer work, she explained: "If I walk, like even sweeping my basement where I live which is tiny, my back immediately [] spasm[s] to the point of screaming. I mean I can't walk any distance. I can't sit for any period of time without moving back and forth." (Tr. 47) Although Plaintiff denied having difficulty being around other people, she also stated "I snap like that…. I scream and holler…. I'm very just agitated all the time." (Tr. 55, 68)

Plaintiff testified that she regularly saw a primary care physician, pain specialist, and psychiatrist. (Tr. 49-50) Her medications included hydrocodone, gabapentin, trazodone, Latuda, Effexor, and a muscle relaxer, which made her feel "goofy" and "knock[s] me out and I don't remember nothing." (Tr. 50-51) Plaintiff testified that, with medication, her pain level was generally a five or six on a ten-point scale. (Tr. 52) Injections she received for back pain did

"not really" help because the "pain moves…. It moves like in a little circle because he does all the shots in like a circle…. So he just moves the pain around." (Tr. 63)

On a typical day, Plaintiff watched television and played computer games. (Tr. 54) She did not have difficulty paying attention to television shows she watched on Netflix. (Tr. 54) Plaintiff went to the grocery store for about thirty minutes once a month but, "by the time I get through the grocery store, I'm dying…. barely making it to my truck. I've had to sit down sometimes up at the front." (Tr. 55) In regard to household chores, Plaintiff stated that, when she bent over to sweep the floor, "it's like an immediate … screaming agony." (Tr. 53) Plaintiff did her own laundry and dishes, but she did not cook meals, instead "everything's in the microwave in a bag[.]" (Tr. 56) Plaintiff was able to drive and estimated that she could drive for "probably an hour" before needing to get out of the car. (Tr. 64)

Plaintiff stated the "heaviest thing" she had lifted in the past month was "maybe" a grocery bag. (Tr. 52) Plaintiff estimated that she could sit for "maybe 15 minutes," stand "maybe 15 minutes, if that," and walk "from … the car to here, or around the building." (Tr. 53) On the day of the hearing, Plaintiff neither wore a back brace nor used a cane. (Tr. 57)

A vocational expert also testified at the hearing. (Tr. 71-76) The ALJ asked the vocational expert to consider a hypothetical individual with Plaintiff's age, education, and work experience, with the following limitations:

> The individual would be able to lift up to 20 pounds occasionally, lift, carry up to 10 pounds frequently. Stand and walk for about six hours and sit for up to six hours in an eight[-]hour workday with normal breaks. The individual would never be able to climb ladders, ropes, or scaffolds, and would occasionally be able to climb ramps or stairs, balance, stoop, kneel, crouch and crawl. The individual would need to avoid all use of dangerous, moving machinery and exposure to unprotected heights. The individual would be able to perform simple, routine and repetitive tasks, in a work environment free of fast[-]paced production requirements, involving only simple work[-]related decisions and routine workplaces changes.

3

(Tr. 72)  The vocational expert testified that such an individual could not perform Plaintiff's past relevant work but could perform other light jobs, such as office helper, "stock checker apparel," and ticket seller.  (Id.)

When the ALJ added the limitation of frequent handling with the right upper extremity, the vocational expert stated that the hypothetical individual could not perform the work of a ticket seller, but could perform the jobs of "stock checker apparel," office helper, and sorter of clothing or garments.  (Tr. 73)  If the hypothetical individual were further limited to sedentary work but with no handling restriction, she would be able to perform the jobs of "order clerk food and beverage," document preparer or scanner, and stuffer of toys or small objects.  (Tr. 75) Finally, the vocational expert testified that, if the hypothetical individual required the ability to "sit stand at will, every 15 minutes," miss more than one day of work per month, or be off task more than nine percent of the workday, she would not be able to sustain competitive employment.  (Tr. 71, 75)

In regard to Plaintiff's medical records, the Court adopts the facts set forth in Plaintiff's statement of uncontroverted facts, as admitted by the Commissioner.  [ECF Nos. 21-1, 24-1] The Court also adopts the additional facts set forth in the Commissioner's response to Plaintiff's statement of material facts because Plaintiff does not dispute them.  [ECF No. 24-1]

### III.    Standards for Determining Disability Under the Act

To be eligible for benefits under the Social Security Act, a claimant must prove he or she is disabled.  42 U.S.C. § 423 (a)(1); Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001). The Act defines disability as "the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period not less than 12

months." 42 U.S.C. § 423(d)(1)(A); See also 20 C.F.R. § 416.905(a). The impairment must be "of such severity that [the claimant] is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy...." 42 U.S.C. § 1382c(a)(3)(B).

To determine whether a claimant is disabled, the Commissioner engages in a five-step evaluation process. See 20 C.F.R. § 416.920; see also McCoy v. Astrue, 648 F.3d 605, 511 (8th Cir. 2011). Those steps require a claimant to show that he or she: (1) is not engaged in substantial gainful activity; (2) has a severe impairment or combination of impairments which significantly limits his or her physical or mental ability to do basic work activities or (3) has an impairment which meets or exceeds one of the impairments listed in 20 C.F.R., Subpart P, Appendix 1; (4) is unable to return to his or her past relevant work; and (5) the impairments prevent him or her from doing any other work. Id.

Prior to step four, the Commissioner must assess the claimant's residual functional capacity (RFC), which is "the most a claimant can do despite [his or her] limitations." Moore v. Astrue, 572 F.3d 520, 523 (8th Cir. 2009) (citing 20 C.F.R. 404.1545(a)(1)); see also 20 C.F.R. §§ 416.920(e), 416.945(a)(1). Through step four, the burden remains with the claimant to prove that he or she is disabled. Moore, 572 F.3d at 523. At step five, the burden shifts to the Commissioner to establish that, given the claimant's RFC, age, education, and work experience, there are a significant number of other jobs in the national economy that the claimant can perform. Id.; Brock v. Astrue, 674 F.3d 1062, 1064 (8th Cir. 2012).

**IV.  ALJ's Decision**

The ALJ applied the five-step evaluation set forth in 20 C.F.R. § 416.920 and found that Plaintiff: (1) had not engaged in substantial gainful activity since October 26, 2016, the

application date; and (2) had the severe impairments of lumbar degenerative disc disease, hepatitis C, obesity, PTSD, major depressive disorder, and alcohol abuse disorder.  (Tr. 13-14) Additionally, the ALJ determined that Plaintiff had the following non-severe impairments:  mild right knee degenerative disc disease, ovarian cyst status – post removal, hypertension, hyperlipidemia, GERD, right foot abrasion, chest wall nodule, and right hand tendinitis.  (Tr. 14) At step three, the ALJ concluded that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (Id.)

The ALJ reviewed Plaintiff's testimony and medical records and determined that Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms," but her "statements concerning the intensity, persistence, and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record[.]"  (Tr. 19)  For example, the ALJ pointed out that, while Plaintiff alleged that she had "marginal to nonexistent walking abilities, her clinical records generally reflect benign gait and strength-related findings."  (Id.)  The ALJ also found that Plaintiff's subjective complaints of pain were undermined by evidence that she did not require surgery, frequent emergency room visits, extended hospitalizations, consistent use of assistive devices, or treatment by numerous specialists.  (Id.)  The ALJ further noted that Plaintiff was "not entirely consistent" with musculoskeletal treatment and she improved with treatment.  (Id.)

In regard to Plaintiff's mental impairments, the ALJ found that Plaintiff's treatment records were "somewhat more conservative than what the allegations suggest[.]"  (Tr. 20)  For example, her mental status examinations were generally unremarkable in the areas of speech, mood, affect, insight, memory, judgment, and thought process and content.  (Id.)  The ALJ also

observed that "several of [her] mental health records are associated with evidence of situational stress" and Plaintiff received conservative mental health treatment, did not require emergency room visits or hospitalizations, and was sometimes noncompliant with her medications. (Id.)

Based on her review of Plaintiff's testimony, medical records, and medical opinion evidence, the ALJ determined that Plaintiff had the RFC to perform a range of light work with the following limitations:

> [T]he claimant is able to lift up to 20 pounds occasionally and lift/carry up to ten pounds frequently. She is able to stand/walk for about six hours and sit for up to six hours in an eight-hour workday, with normal breaks. She is unable to climb ladders/ropes/scaffolds, but is occasionally able to climb ramps/stairs, balance, stoop, kneel, crouch, and crawl. She should avoid all exposure to unprotected heights and use of dangerous moving machinery. She is able to perform simple, routine, and repetitive tasks in a work environment free of fast-paced production requirements, involving only simple work-related decisions and routine workplace changes. She is able to engage in frequent handling with the right upper extremity.

(Tr. 16-17)  Based on the vocational expert's testimony, the ALJ found that Plaintiff could not perform her past relevant work but could perform other jobs that existed in significant numbers in the national economy, such as office helper, stock checker, and sorter (clothing). (Tr. 22-23) The ALJ therefore concluded that Plaintiff was not disabled. (Tr. 23)

## V.    Discussion

Plaintiff claims that the ALJ erred in finding she was not disabled because:  (1) substantial evidence did not support the ALJ's RFC determination; and (2) the ALJ failed to account for Plaintiff's obesity.  [EF No. 21]  The Commissioner counters that:  (1) substantial evidence supported the ALJ's finding that Plaintiff was limited to a range of light work with additional postural, environmental, and mental limitations; and (2) the ALJ properly considered Plaintiff's obesity.  [ECF No. 24]

### A.  Standard of Judicial Review

7

A court must affirm an ALJ's decision if it is supported by substantial evidence. 42 U.S.C. § 405(g). "Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." Chesser v. Berryhill, 858 F.3d 1161, 1164 (8th Cir. 2017) (quoting Prosch v. Apfel, 201 F.3d 1010, 1012 (8th Cir. 2000)). A court must consider "both evidence that supports and evidence that detracts from the ALJ's decision, [but it] may not reverse the decision merely because there is substantial evidence support[ing] a contrary outcome." Id. (quoting Prosch, 201 F.3d at 1012) (internal quotation marks omitted).

A court does not "reweigh the evidence presented to the ALJ, and [it] defer[s] to the ALJ's determinations regarding the credibility of testimony, as long as those determination are supported by good reasons and substantial evidence." Renstrom v. Astrue, 680 F.3d 1057, 1064 (8th Cir. 2012) (quoting Gonzales v. Barnhart, 465 F.3d 890, 894 (8th Cir. 2006)). Therefore, a court must affirm the ALJ's decision if "it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings[.]" Wright v. Colvin, 789 F.3d 847, 852 (8th Cir. 2015) (quoting Perkins v. Astrue, 648 F.3d 892, 897 (8th Cir. 2011)).

B.  RFC

Plaintiff contends that substantial evidence did not support the ALJ's RFC determination because the ALJ "improperly drew inferences from the medical reports and relied on the opinions of non-treating, non-examining medical consultants[.]" [ECF No. 21 at 4] In response, the Commissioner asserts that the ALJ "properly considered the entire record, pointed to evidence and inconsistencies in the record supporting her evaluation of Plaintiff's subjective complaints, and adequately accounted for Plaintiff's supportable degree of limitation in determining her RFC." [ECF No. 24]

8

RFC is the most a claimant can still do in a work setting despite that claimant's physical or mental limitations. Martise v. Astrue, 641 F.3d 909, 923 (8th Cir. 2011) (citation omitted); 20 C.F.R. § 416.945(a)(1). An ALJ determines a claimant's RFC "based on all the relevant evidence, including medical records, observations of treating physicians and others, and [claimant's] own description of her limitations." Page v. Astrue, 484 F.3d 1040, 1043 (8th Cir. 2007) (alteration in original) (quoting Anderson v. Shalala, 51 F.3d 777, 779 (8th Cir. 1995)).

Although the ALJ bears the primary responsibility for assessing a claimant's residual functional capacity based on all relevant evidence, "a claimant's residual functional capacity is a medical question." Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001) (quoting Singh v. Apfel, 222 F.3d 448, 451 (8th Cir. 2000)). See also Hutsell v. Massanari, 259 F.3d 707, 712 (8th Cir. 2001). "Because a claimant's RFC is a medical question, an ALJ's assessment of it must be supported by some medical evidence of the claimant's ability to function in the workplace." Hensley v. Colvin, 829 F.3d 926, 932 (8th Cir. 2016) (quoting Cox v. Astrue, 495 F.3d 614, 619 (8th Cir. 2007)). "An administrative law judge may not draw upon his own inferences from medical reports." Nevland v. Apfel, 204 F.3d 853, 858 (8th Cir. 2000).

1. Mental RFC

Plaintiff argues that the ALJ erred in formulating her mental RFC because the only medical opinion in the record was a medical source statement (MSS) completed by a non-examining consultant who opined that Plaintiff did not have a severe mental impairment. Defendant counters that the ALJ properly reached a legal determination based upon her assessment of Plaintiff's subjective complaints and Plaintiff's mental status examinations, conservative mental health treatment, activities of daily living, and MSS.

9

Plaintiff correctly asserts that the opinions of non-examining or consultative sources do not, by themselves, constitute substantial evidence on the record as a whole. Vossen v. Astrue, 612 F.3d 1011, 1016 (8th Cir. 2010); Wildman v. Astrue, 596 F.3d 959, 967 (8th Cir. 2010). However, such opinions may properly be considered along with the other evidence of record. See Casey v. Astrue, 503 F.3d 687, 694 (8th Cir. 2007) ("The ALJ did not err in considering the opinion of [the State agency medical consultant] along with the medical evidence as a whole.")

Plaintiff's medical records reveal that she saw psychiatrist Dr. Gaskin approximately every two months from December 2015 through April 2018. In the first half of 2016, Plaintiff consistently reported feeling irritable and depressed, but in September 2016 she informed Dr. Gaskin that the "medicine is perfect" and "I haven't been arguing, I got my sense of humor back." (Tr. 317) In January and March 2017, Plaintiff again reported that her medications were effectively controlling her symptoms. (Tr. 576-77)

After Plaintiff reported having "no filter" and being "very mean" in June 2017, Dr. Gaskin changed Plaintiff's medications from Effexor and Buspar to Cymbalta and trazodone. (Tr. 573-74). In August, Plaintiff informed Dr. Gaskin that the Cymbalta "keeps me pretty normal…. It works, makes me feel even." (Tr. 574) Plaintiff's mood and symptoms worsened, however, after October 2017 due to ongoing conflict between Plaintiff and her son's girlfriend, who resided with them. (Tr. 570-73) Dr. Gaskin adjusted Plaintiff's medications in February and March 2018. (Tr. 570-71) In April 2018, Plaintiff informed Dr. Gaskin that she was "alright" and "things are starting to look up" because her son's girlfriend had moved out. (Tr. 569)

In January 2017, consulting psychologist Dr. Dempsey completed a psychiatric review technique (PRT) and MSS based on Plaintiff's medical records and function report. (Tr. 107-11)

10

Dr. Dempsey diagnosed Plaintiff with "depressive, bipolar, and related disorders," and found that Plaintiff had mild limitations in her ability to interact with others and no limitations in her abilities to: understand, remember, or apply information; concentrate, persist, or maintain pace; and adapt or manage oneself. (Tr. 107) Dr. Dempsey concluded: "[C]laimant is no more than mildly impaired by depression. Therefore[,] it is reasonable that depression does not significantly affect her ability to work." (Tr. 108)

In her decision, the ALJ reviewed Dr. Gaskin's treatment notes, including his mental status examinations. The ALJ noted that Dr. Gaskin's clinical examinations documented abnormalities, including signs of irritable/anxious moods, rapid speech, suicidal thoughts, insomnia, and labile affect, but found that Plaintiff's healthcare providers "generally described her as unremarkable in terms of her alertness, orientation, memory, and judgment." (Tr. 18, 20) The ALJ also observed that Plaintiff's symptoms have been "managed with routine and little-changed outpatient care modalities." (Tr. 20) "If an impairment can be controlled by treatment or medication, it cannot be considered disabling." Hensley, 829 F.3d at 933-34 (quoting Brace v. Astrue, 578 F.3d 882, 885 (8th Cir. 2009)). Finally, the ALJ noted that Plaintiff's treatment records reflected that her depressive episodes were associated with situational stresses. (Tr. 20) See, e.g., Tindell v. Barnhart, 444 F.3d 1002, 1007 (8th Cir. 2005) (situational depression did not support a finding of disability); Dunahoo v. Apfel, 241 F.3d 1033, 1039-40 (8th Cir. 2001) (depression resulting from financial difficulties was situational and not disabling).

Based on her review of Plaintiff's medical records and testimony, the ALJ assigned Dr. Dempsey's opinion that Plaintiff's mental impairment was non-severe "light weight." (Tr. 21) She acknowledged that Dr. Dempsey was a "mental health specialist addressing her area of expertise" and agreed with Dr. Dempsey that the "nature and frequency of the conservative

11

mental" treatment undermined the alleged severity and limiting effects of Plaintiff's mental impairments. (Id.) However, the ALJ stated that Dr. Dempsey's finding of "non-severity goes too far," and determined that Plaintiff was considerably more limited by her mental impairments than Dr. Dempsey had opined.[2] (Id.) The ALJ accommodated Plaintiff's mental impairments in the RFC by limiting her to: simple, routine, and repetitive tasks; no fast-paced production requirements; and only simple work-related decisions and routine workplace changes. (Tr. 17) The ALJ reasoned that these limitations "better account[] for the subjective allegations, the additional mental treatment and clinical abnormalities, and the combination of mental impairments, substance abuse, and physical pain/pain-medication-side-effects." (Tr. 21)

Plaintiff claims that the ALJ erred in relying on Dr. Dempsey's opinion. However, the ALJ assigned Dr. Dempsey's opinion "little weight" and found that Plaintiff was considerably more limited than Dr. Dempsey had opined. Furthermore, while the opinion of a consulting physician alone does not generally constitute substantial evidence, the ALJ did not rely solely on Dr. Dempsey's opinion, but also conducted an independent review of the medical evidence. See Krogmeier v. Barnhart, 294 F.3d 1019, 1024 (8th Cir. 2002).

Plaintiff also argues, without providing any examples, that the ALJ improperly drew her own inferences from the medical records. Plaintiff cites Lund v. Weinberger for the proposition that an "administrative law judge may not draw upon his own inferences from medical reports." 520 F.2d 782, 785 (8th Cir. 1975). Lund is distinguishable, however, in that the "only medical evidence in the record of [the plaintiff's] ability to do work [was] favorable to him; his own doctor stated that he did 'not know of any jobs that would not increase his headaches and neck

---

[2] In her PRT, the ALJ stated that Plaintiff was moderately limited in concentration, persistence, or pace and mildly limited in the areas of: understanding, remembering, or applying information; social interaction; and adapting or managing oneself. (Tr. 15-16)

12

pains.'"  Id. at 785.  Here, by contrast, no medical provider stated that Plaintiff was unable to work or imposed non-exertional limitations more restrictive than those identified by the ALJ. Upon review of the record, the Court finds that substantial evidence on the record as a whole – including Dr. Gaskin's treatment notes, Dr. Dempsey's medical opinion, and evidence of Plaintiff's testimony and her daily activities – supported the ALJ's mental RFC determination.

    2.  Physical RFC

Plaintiff also challenges the ALJ's physical RFC determination, arguing that the ALJ relied on the opinion of a non-examining consulting physician who rendered his opinion before Plaintiff's February 2017 and was not able to consider Plaintiff's later pain management treatment, which included "no less than 7 injections."  [ECF No. 21]  In response, the Commissioner asserts that "[b]ecause the state agency physician's opinion was consistent with the other credible medical evidence, it was proper for the ALJ to rely on it, in part, in formulating Plaintiff's RFC."  [ECF No. 24 at 7]

Consulting physician Dr. Smith reviewed Plaintiff's medical records in January 2017 and completed a MSS, which stated that Plaintiff had a history of lumbar degenerative disc disease, osteoarthritis involving multiple joints, HTN, hepatitis C, and obesity.  (Tr. 108-11)  Dr. Smith discussed Plaintiff's March 2016 lumbar spine MRI "showing minimal disc bulge at L2-L5, mild to moderate degenerative facet disease"[3] and an x-ray of her right knee showing "mild medial

---

[3] The report of Plaintiff's March 2016 MRI contained the following impressions:

>L1-2 dis[c] space is unremarkable
>L2-3 dis[c] spaces shows a minimal dis[c] bulge and mild to moderate degenerative facet disease.
>L3-4 shows moderate degenerative fact disease, minimal spondylosthesis and minimal dis[c] bulge.  No spinal canal or neural foraminal stenosis.
>L4-5 shows minimal dis[c] bulge.  No spinal canal or neural foraminal stenosis.

13

tibiofemoral degenerative arthritis." (Tr. 111)  Dr. Smith also noted that Plaintiff had received two injections, took pain medications, and was fitted for a back brace. (Id.)  At a November 2016 appointment, Plaintiff informed her primary care physician that "she had been working on son's house a lot[.]"  (Id.)  A physical examination the same month revealed poor posture, ambulation without difficulty, normal strength, negative straight leg raise test, deep tendon reflexes 2-3 out of 4, and positive toe and heel stand. (Id.)

Based on his review of Plaintiff's medical records and her self-reported activities of daily living, Dr. Smith opined that Plaintiff could occasionally lift/carry twenty pounds, frequently lift/carry ten pounds, stand and/or walk six hours in an eight-hour workday, and sit six hours in an eight-hour workday. (Tr. 109)  In regard to postural limitations, Dr. Smith found that Plaintiff could frequently climb ramps/stairs and balance, and she could occasionally climb ladders/ropes/scaffolds, stoop, kneel, crouch, and crawl. (Tr. 111)  Dr. Smith concluded that Plaintiff "could reasonably be limited to a light exertional level." (Id.)

After Dr. Smith completed his MSS, Plaintiff underwent another lumbar spine MRI[4] and continued monthly treatment with her pain specialist Dr. Padda, who prescribed pain medication,

---

        L5-S1 dis[c] space is unremarkable.

(Tr. 754)

[4] The report of Plaintiff's subsequent MRI, performed in February 2017, contained the following impressions:
1. Disc dehydration is noted at L2-3 and L3-4 levels.
2. L2-3:  Diffuse disc protrusion with effacement of the thecal sac.  Spinal canal is compromised.  Neuroforaminal narrowing without significant impingement of exiting nerve roots.
3. L3-4:  Diffuse disc protrusion with effacement of the thecal sac.  Spinal canal is compromised.  Neuroforaminal narrowing without significant impingement of exiting nerve roots.
4. L4-5:  Diffuse disc protrusion with effacement of the thecal sac.  Spinal canal is compromised.  Disc material and facet hypertrophy causing bilateral neuroforaminal narrowing that effaces the left and right L4 exiting nerve roots.

14

including narcotics, and administered regular injections.  In February 2017, Dr. Padda observed that Plaintiff had a "severe antalgic gait with pelvic tilt approximately 5-7 degrees," axial low back pain with SI tenderness, and low back, hip, and groin pain unrelieved by conservative therapies.  (Tr. 725)  After Dr. Padda administered bilateral sacroiliac joint injections, Plaintiff reported "[n]early 80-90% reduction in SI joint symptomology with improvement in gait, reduction in compression pain, and SI side to side mobility improved."  (Tr. 726)  Plaintiff again reported immediate reduction in symptomology after her injections in March 2017 and March and May 2018.[5]  (Tr. 715-20, 728-29, 723-26)

In her decision, the ALJ reviewed Plaintiff's medical records and assigned Dr. Smith's opinion "some weight."  (Tr. 21)  The ALJ explained that the "nature and frequency of the conservative gait and strength-related clinical evidence" and "the lack of objectively confirmed long-term need for a cane or similar device" supported some of Dr. Smith's postural and environmental restrictions.  (Id.)  See, e.g., Perkins v. Astrue, 648 F.3d 892, 989-99 (8th Cir. 2011) (appropriate for ALJ to consider claimant's conservative treatment and lack of assistive device).  However, the ALJ added more restrictive postural and manipulative limitations "to account for the subjective pain allegations, and possible overlap/aggravation between the spine/liver/mental and remote wrist and recent hand treatment."  (Id.)  The ALJ therefore limited Plaintiff to light work with the following limitations:  no climbing ladders/ropes/scaffolds; occasionally climb ramps/stairs, balance, stoop, kneel, crouch, and crawl; no exposure to unprotected heights and use of dangerous moving machinery; and frequent handling with the right upper extremity.  (Tr. 16-17)

---

(Tr. 748-49)
[5] Plaintiff's later medical records also contained statements to her providers regarding spending much of her time on the computer and working at a friend's parking lot.  (See Tr. 497, 538)

The Court's review of the record shows that Dr. Smith's January 2017 report was consistent with the medical evidence as of that date.  See Casey, 503 F.3d at 694.  To the extent Plaintiff's later medical records reflected a worsening of her conditions and attendant symptoms, the ALJ acknowledged these changes and accommodated Plaintiff's increased limitations in the RFC.

The record contained substantial evidence to support the ALJ's RFC assessment, which properly accounted for her back and joint pain.  "If substantial evidence supports the ALJ's decision, we will not reverse the decision merely because substantial evidence would have also supported a contrary outcome, or because we would have decided differently."  Wildman, 596 F.3d at 964.  Although Plaintiff cites evidence that might support a contrary decision, substantial evidence supported the ALJ's RFC determination and, as such, this Court is required to affirm.

C.  Obesity

Plaintiff claims that the ALJ erred in determining her RFC because she failed to consider "any functional limitations resulting from the obesity."  [ECF No. 21 at 6]  The Commissioner counters that the ALJ properly considered Plaintiff's obesity and the record did not support limitations beyond those included in the ALJ's RFC determination.  [ECF No. 24]

The SSA recognizes that "[t]he combined effects of obesity with musculoskeletal impairments can be greater than the effects of each of the impairments considered separately." 20 C.F.R. § 404, Subpt. P, App'x 1, § 1.00(Q). See also SSR 02–1p, 2002 WL 34686281, at *3 (Sept. 12, 2002).  Thus, at all stages of the sequential evaluation process, including the RFC determination, "adjudicators must consider any additional and cumulative effects of obesity." 20 C.F.R. 404, Subpt. P, App'x 1, § 1.00(Q).  However, the Eighth Circuit has held that "[w]hen an ALJ references the claimant's obesity during the claim evaluation process, such review may be

16

sufficient to avoid reversal." Wright, 789 F.3d at 855 (quoting Heino v. Astrue, 578 F.3d 873, 881 (8th Cir. 2009)).

In this case, the ALJ noted Plaintiff's diagnoses for obesity and BMI scores "in the mid-upper 30s." (Tr. 18)  The ALJ found that Plaintiff's obesity was a severe impairment and stated that Plaintiff's "combination of impairments [was] noteworthy." (Tr. 14, 18)  Citing SSR 02-01p, the ALJ explained: "[O]besity can both cause limitations and aggravate other impairments beyond what the record would otherwise support.  E.g., postural limitations caused by obese body habitus, and an increase in pain-related limitations caused by extra weight on sensitive weight-bearing joints." (Tr. 18)

Although Plaintiff argues that the ALJ failed to include in the RFC limitations relating to her obesity, she does not identify any functional restrictions caused by her obesity.  The Court finds that the ALJ properly accounted for Plaintiff's obesity when formulating the RFC. "Because the ALJ specifically took [Plaintiff's] obesity into account in [her] evaluation, we will not reverse that decision." Heino, 578 F.3d at 881-82.

## I.     Conclusion

For the reasons discussed above, the Court finds that substantial evidence in the record as a whole supports Defendant's decision that Plaintiff is not disabled. Accordingly,

**IT IS HEREBY ORDERED** that the final decision of Defendant denying Social Security benefits to Plaintiff is **AFFIRMED**.

A separate judgment in accordance with this Memorandum and Order is entered this date.

_____
PATRICIA L. COHEN
UNITED STATES MAGISTRATE JUDGE

Dated this 6th day of October, 2020